Daniel B. McCORVEY, Plaintiff,

v.

UTAH STATE DEPARTMENT OF TRANSPORTATION and LeGrand Johnson Construction Company, a Utah corporation, Defendants.

Daniel B. McCORVEY, Plaintiff and Appellant,

v.

UTAH STATE DEPARTMENT OF TRANSPORTATION and LeGrand Johnson Construction Company, a Utah corporation, Defendants and Appellees.

Daniel B. McCORVEY, Plaintiff and Appellee,

v.

UTAH STATE DEPARTMENT OF TRANSPORTATION and LeGrand Johnson Construction Company, a Utah corporation, Defendants and Appellants.

Nos. 910054, 910069 and 910084.

Supreme Court of Utah.

Nov. 10, 1993.

David R. Olsen and Jesse C. Trentadue, Salt Lake City, for McCorvey.

R. Paul Van Dam, Atty. Gen. and Annina M. Mitchell, Asst. Atty. Gen., Salt Lake City, for UDOT.

HALL, Chief Justice:

This is a consolidated appeal from a jury verdict entered in favor of plaintiff Daniel B. McCorvey in a personal injury action brought against the Utah Department of Transportation ("UDOT") and LeGrand Johnson Construction Company ("Le-Grand").[1] We affirm.

## I. FACTS

"Where evidence is in conflict in a jury trial, we assume that the jury believed those facts that support its verdict, and we view the facts and the reasonable inferences that arise from those facts in a light most supportive of the jury's verdict."[2] We recite the facts accordingly.

On August 7, 1986, McCorvey was paralyzed when his car left the road and rolled in the median on Interstate 15 near Cove Fort, Utah. The accident occurred in a construction area where the road was being resurfaced by a process referred to as "chip sealing." Chip sealing involves applying an oil-based emulsion onto the highway and then placing gravel on top of the emulsion. The gravel is then pressed into the emulsion by huge rollers. Next, the surface is swept, or "broomed," to remove any excess gravel. Finally, normal highway traffic is used to further imbed the gravel into the new surface. During the process, excess chips are used so that the gravel will be as dense as possible.

UDOT, which maintains Utah's interstate highways, retains independent contractors to do much of the necessary highway repair. LeGrand was awarded the contract to resurface the project at issue in this case. Although LeGrand was responsible for the actual resurfacing on the project, UDOT supplied the traffic control plan and was ultimately responsible for motorist safety.[3]

---

1. Although LeGrand filed the first notice of appeal in this matter, it was subsequently dismissed as a party. The other two cases were consolidated under case number 910054.

2. *Ong Int'l v. 11th Ave. Corp.*, 850 P.2d 447, 449 (Utah 1993) (citing *Bennion v. LeGrand Johnson Constr. Co.*, 701 P.2d 1078, 1082 (Utah 1985)).

3. LeGrand was responsible for setting up the signs necessary to control traffic flow through the project. However, UDOT had an on-site inspector who had the authority to modify the plan at any time. The UDOT inspector also oversaw the progress of the actual construction project and could correct any errors occurring there.

The 15-mile construction project began approximately 10 miles north of the accident site in the two southbound lanes. Under the traffic control plan, one lane would be closed during the chip spreading process. The plan called for placement of two "early warners," large electric signs with arrows directing traffic from one lane into another, that would guide traffic into the lane that was not being chipped. The early warner signs would have "speed limit 25 miles per hour" signs affixed to them. Several "no passing" signs would line the project, and "loose gravel" signs would greet motorists at the beginning of the project.

At the time the accident occurred, LeGrand had resurfaced most of the 15 miles. However, it neglected to broom the right-hand outside lane near the accident site. Consequently, the right lane was still covered with excess gravel that was in turn thrown into the left inside lane by passing motorists. The left lane, which was already broomed, still had a significant amount of gravel on it, especially close to the median to the left of the lane.

On the day of the accident, McCorvey was traveling south on I–15 with a friend, Paul Page, in a 1986 Honda Civic. McCorvey testified that he first encountered construction several miles north of the accident scene where LeGrand was resurfacing a rest area. He slowed and passed through that area without event. He was in the left lane resuming normal highway speed when he hit a section of road that was covered with thick gravel. When he encountered the gravel, he downshifted and reduced his speed to approximately 45 miles per hour.

McCorvey began to lose control of the Honda almost immediately. He testified that the left lane had deep grooves in which it was possible to travel but that ridges of gravel lined the grooves, making it difficult to maneuver. The unswept right lane was worse, with gravel across the entire lane. The Honda's tires were throwing excess chips from the road up into the air. As McCorvey proceeded south, a twelve-passenger Suburban van approached him from behind. The van was driven by P. Wayne Wright and contained four adults and six children.

Gravel thrown by the Honda's tires broke the windshield of the Suburban, prompting Wright to attempt to pass the Honda in the right-hand outside lane. As Wright came abreast of McCorvey, the Suburban threw up a large amount of gravel, showering the Honda on its right side. McCorvey testified that he hit a big patch of gravel and lost control of his car as he attempted first to accelerate to stay ahead of the Wrights and then to slow down and drop back.

The Honda left the highway and entered the median, traveling between 52 and 62 miles per hour. McCorvey panicked and attempted to steer back onto the road, which caused the car to roll at least twice. McCorvey and his passenger were ejected, and both suffered paralyzing injuries.

All of the witnesses who were traveling the same stretch of road at the time of the accident testified that both lanes were open for travel and that they had not seen any traffic control signs for several miles. Moreover, McCorvey's testimony indicated that LeGrand employees may have placed "do not pass" and early warner signs on the road after the accident to make it appear as if they were there when the crash occurred.

The witnesses also agreed that there should have been more control of the project so that cars could not pass and that the right lane should have been closed. All the cars in which the witnesses were traveling suffered chipped paint and broken windshields from flying gravel, and all the drivers were extremely irate about the road conditions.

McCorvey's experts testified that the crash was caused by the excess gravel on the road and the inadequate signing on the project. One expert cited the combination of contradictory signing, such as the use of both 25– and 55–mile–per–hour speed limit signs in the construction zone,[4] the prior "no passing" signs, and the fact that both lanes were open to traffic as the cause of the accident. The lack of warning and guidance on the dangerous road caused drivers to react in ways that

---

4. A 25–mile–per–hour advisory speed limit sign was posted at the beginning of the project. However, at the accident scene the posted speed limit was 55 miles per hour.

might otherwise be considered unreasonable to avoid gravel damage to their cars.[5]

Although there was testimony that not all of the required signs were actually in place that day, McCorvey's traffic engineering expert testified that even if all the signs had been placed correctly, UDOT's traffic control plan was inadequate and did not comply with federal safety guidelines. The plan failed to provide drivers with sufficient warning of the hazards presented by the loose gravel. Also, it failed to physically close off the outside right lane until it had been swept, and it did not impose a speed slower than the 55–mile–per–hour speed posted for the unswept lane. On the other hand, defendants' experts testified that the plan was adequate and that the accident was caused by driver error on McCorvey's part.

The jury returned a verdict in favor of McCorvey and attributed fault for the accident as follows: LeGrand, 50 percent; UDOT, 28 percent; McCorvey, 10 percent; and Wright, 12 percent. UDOT's proportionate share of liability of $1,517,800 was reduced to $250,000 pursuant to Utah Code Ann. § 63–30–34, which limits the amount of damages recoverable against the state.[6] UDOT moved for a new trial, claiming that the evidence was insufficient to support the verdict against it. The trial court denied the motion.

McCorvey appeals that portion of the final judgment reducing his recovery against UDOT to $250,000. He claims that the damage recovery limit is unconstitutional as applied to him. UDOT appeals from the denial of its motion for a new trial, claiming that the evidence was insufficient to support the jury's finding that UDOT proximately caused McCorvey's injury, and that the "sudden peril" instruction given to the jury constituted prejudicial error. For ease of organization, we first address the issues raised by UDOT's appeal.

## II. SUFFICIENCY OF THE EVIDENCE

A trial court's denial of a motion for a new trial based on a claim of insufficiency of the evidence will be reversed "only if, viewing the evidence in the light most favorable to the prevailing party, the evidence is insufficient to support the verdict."[7] To support this claim on appeal, "the one challenging the verdict must marshal the evidence in support of the verdict and then demonstrate that the evidence is insufficient when viewed in the light most favorable to the verdict."[8]

UDOT does not dispute the jury's finding that it was negligent. Instead, it claims that no reasonable jury could conclude that its negligence was a proximate cause of McCorvey's injury. It claims that its actions were not the proximate cause of McCorvey's injury because (1) omissions in the traffic control plan were not the substantial causative factor leading to the accident, and (2) even if UDOT's negligence was a substantial causative factor, the negligent actions of LeGrand, McCorvey, and Wright were intervening forces that became the superseding cause of the accident. We address each allegation in turn.

UDOT first asserts that even if its traffic control plan was substandard, the flawed plan was not the substantial causative factor leading to the accident. Its prior negligence in adopting the traffic control plan, UDOT claims, was minimal and insignificant in comparison to the other parties' acts, and cannot be seen as the proximate cause of the accident.

---

5. For instance, one man who was hauling a trailer testified that he began to weave back and forth between the two lanes to keep the Wrights' Suburban from passing him and damaging his car and trailer. He finally let the Wrights pass and suffered a broken windshield as a result.

6. McCorvey also was awarded $2,710,641, which represented LeGrand's proportionate share of liability.

7. *Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 799 (Utah 1991) (citing *Hansen v. Stewart*, 761 P.2d 14, 17 (Utah 1988)).

8. *Id.* (citing *Morgan v. Quailbrook Condominium Co.*, 704 P.2d 573, 577 n. 3 (Utah 1985); *Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985)).

■ Generally, proximate cause is an issue for the jury to decide.[9] To establish proximate cause, McCorvey must prove that UDOT's conduct was a substantial causative factor leading to his injury.[10] However, as the jury was correctly instructed, there can be more than one proximate cause or, more specifically, substantial causative factor, of an injury.[11]

■ The jury determined the levels of fault of all the parties and attributed 28 percent of the fault to UDOT. Although UDOT attempts to characterize the accident as a road race between McCorvey and Wright and a "macho game of chicken" for which the drivers themselves were to blame, the evidence supports a different version of the events. The jury heard expert and eyewitness testimony concerning the effect the flawed traffic plan had on the drivers on I–15 that day. Because of the lack of positive guidance, drivers were doing whatever they thought was necessary and reasonable to avoid harm to their vehicles and to themselves.

The jury did determine that both McCorvey and Wright were negligent and that their negligence was a proximate cause of, and therefore a substantial causative factor contributing to, McCorvey's injury. However, based on the record evidence, a reasonable jury likewise could have found that the flawed plan and UDOT's failure to supervise the project adequately were also substantial causative factors leading to the accident.

■ UDOT next argues that two intervening forces—LeGrand's negligence in failing to remove the excess gravel from the highway and McCorvey and Wright's alleged "high speed road race"—were superseding causes of the accident and cut off any liability that UDOT may have had as a result of the flawed traffic plan. Under the law of superseding causation, "[a] person's negligence is not superseded by the negligence of another if the subsequent negligence of another is foreseeable" to the original actor.[12] In other words, if the negligent acts of LeGrand, McCorvey, or Wright were foreseeable to UDOT, then UDOT cannot be relieved of its share of liability.

In this case, the jury was properly instructed on the issue of superseding cause and necessarily determined that the negligence of one or more of the other actors was foreseeable. We see no error in the jury's findings in this regard.

A reasonable jury could have determined that UDOT's negligent supervision of the project would lead to LeGrand's failure to remove the excess chips in a proper fashion. Moreover, the inadequate traffic plan, in which motorists were passing each other at 55 miles per hour on a gravel-covered road, caused extreme agitation among the drivers on I–15. Under those circumstances, the jury reasonably could believe that the actions of McCorvey and Wright were foreseeable.

In sum, the record amply supports the jury's determination that UDOT's negligence was a proximate cause of McCorvey's injury. The trial court did not err when it denied UDOT's motion for a new trial on this issue.

## III. SUDDEN–PERIL INSTRUCTION

■ UDOT next objects to the "sudden-peril instruction" that was given to the jury.[13]

9. *Thompson v. LeGrand Johnson Constr. Co.*, 688 P.2d 489, 491 (Utah 1984) (citing *Watters v. Querry*, 626 P.2d 455, 457–58 (Utah 1981)).

10. *Mitchell v. Pearson Enter.*, 697 P.2d 240, 246 (Utah 1985); *Hall v. Blackham*, 18 Utah 2d 164, 169, 417 P.2d 664, 667 (1966); *see also* Restatement (Second) of Torts § 431(a) (1965).

11. *See Anderson v. Parson Red–E–Mix Paving Co.*, 24 Utah 2d 128, 130, 467 P.2d 45, 46 (1970), *overruled on other grounds by Harris v. Utah Transit Auth.*, 671 P.2d 217 (Utah 1983); *Marsh v. Irvine*, 22 Utah 2d 154, 157, 449 P.2d 996, 998 (1969).

12. *Harris*, 671 P.2d at 219; *see also Mitchell*, 697 P.2d at 246; *Jensen v. Mountain States Tel. & Tel. Co.*, 611 P.2d 363, 365 (Utah 1980); Restatement (Second) of Torts § 447 (1965).

13. The full text of that instruction is as follows:

A person who is suddenly and unexpectedly confronted with a peril arising from either the actual presence or the appearance of imminent danger to himself or to others is not expected nor required to use the same judgment and prudence as required of him in calmer and more deliberate moments. His duty is to exercise only the care which an ordinary person would exercise in the same situation. If at

That instruction informed the jury that a person who, without negligence on his or her part, is suddenly confronted with peril is not required to use the same judgment required in calmer moments.[14] UDOT raises two objections to the instruction: first, that it was prejudicial error to give it under Utah's comparative fault system, and second, that the evidence did not support giving the instruction to the jury.

By UDOT's own admission, it did not raise an objection at trial concerning the instruction's continued viability under Utah's comparative fault system. Under Utah Rule of Civil Procedure 51, "[n]o party may assign as error the giving or the failure to give an instruction unless he [or she] objects thereto."[15] UDOT asks this court to consider its objection to the instruction pursuant to another portion of rule 51 under which an appellate court may, in its discretion and in the interests of justice, review the giving or failing to give an instruction.[16]

We hold that discretionary review in this case is not appropriate. UDOT has not demonstrated that justice will be furthered by our consideration of an alleged error that it failed to raise at trial.[17] Therefore, we decline to consider this challenge to the sudden-peril instruction.

UDOT next argues that the evidence at trial did not support the submission of the instruction to the jury. UDOT claims that no sudden emergency existed or, alternatively, that if one did exist, it was the product of McCorvey's own negligence.

It is not error for the trial court to give a sudden-peril instruction if it is consistent with the proponent's theory of the case and supported by some evidence.[18] Here, McCorvey's theory of the case was that he was faced with imminent danger when Wright pulled up beside him in the outside right lane and began to pummel his Honda with gravel. McCorvey testified that he was trapped in the left lane by the gravel grooves and tried first to speed up and then to slow down to avoid Wright. His car left the road after hitting a mound of gravel as he attempted to slow down and fall behind Wright.

The evidence presented at trial amply supports McCorvey's theory that he was faced with a sudden peril and acted accordingly. Given that evidence, " 'it [was] for the jury to determine whether an emergency existed.' "[19] We find no error in the trial court's submitting the sudden-peril instruction to the jury.

## IV. LIMITATION ON UDOT'S DAMAGES

After the jury returned its verdict, UDOT filed a motion objecting to the $1,517,800 judgment against it. UDOT claimed that the judgment should be reduced pursuant to section 63–30–34(1) (1987) of the Government Immunity Act (the "Act"), which limits recovery against a government entity to $250,000.[20] McCorvey objected to any reduction,

that moment he does what appears to him to be the best thing to do, and if his choice and manner of action are the same as might have been followed by any ordinary prudent person under the same conditions, he does all the law requires of him, although in light of after events, it should appear that a different course would have been better or safer.

However, the presence of such an emergency or sudden peril does not constitute such an excuse or justification for negligence if the emergency or sudden peril was caused by that driver's own fault.

14. *See Christiansen v. Utah Transit Auth.,* 649 P.2d 42, 47 (Utah 1982); *Hillier v. Lamborn,* 740 P.2d 300, 301–02 (Utah Ct.App.), *cert. denied,* 765 P.2d 1277 (Utah 1987).

15. Utah R.Civ.P. 51; *see also Crookston,* 817 P.2d at 799.

16. Utah R.Civ.P. 51; *Crookston,* 817 P.2d at 799.

17. *See Crookston,* 817 P.2d at 799.

18. *Christiansen,* 649 P.2d at 47 (citing *Jaeger v. Estep,* 235 Or. 212, 384 P.2d 175 (1963); *Grapp v. Peterson,* 25 Wash.2d 44, 168 P.2d 400 (1946)); *see also Hillier,* 740 P.2d at 302.

19. *Redd v. Airway Motor Coach Lines, Inc.,* 104 Utah 9, 18, 137 P.2d 374, 378 (1943) (quoting *Dobrow v. Hertz,* 125 N.J.L. 347, 15 A.2d 749, 751 (1940)).

20. Section 63–30–34(1) (1987) states in pertinent part:

(1) . . . [I]f a judgment for damages for personal injury against a governmental entity, or an employee whom a governmental entity has

claiming that our ruling in *Condemarin v. University Hospital* [21] renders the damage recovery limitation in section 63–30–34(1) unconstitutional. After receiving memoranda and hearing oral argument on the subject, the trial court reduced the judgment to $250,000.

On appeal, McCorvey again challenges the constitutionality of the damage cap. He argues that imposition of the cap violates his rights under article I, sections 7, 10, 11, and 24 of the Utah Constitution. [22] He relies primarily on *Condemarin* and asks this court to extend that decision to this case.

In its memorandum decision, the trial court concluded that *Condemarin* hinged on a determination that a person injured by a government entity exercising a nonessential or proprietary function has a fundamental right to full recovery for his or her injuries. The trial court reasoned that because UDOT's road maintenance activities traditionally have been considered governmental, no fundamental right was involved and *Condemarin's* heightened constitutional analysis was inapplicable.

We believe that the trial court's memorandum is well reasoned. *Condemarin's* holding that section 63–30–34(1) was unconstitutional

as applied to the University Hospital was premised on the conclusion that the hospital exercised a proprietary or nonessential function for which a right to recover at common law existed. [23] Because section 63–30–34(1) abrogated the common law right to recover fully against a government entity engaged in a nonessential function, the cap violated the open courts clause. [24] That, in turn prompted the court to apply heightened scrutiny to the cap. [25]

The government activity in question here is the maintenance of public roads. At common law, both the municipalities and the state were immune from lawsuits based on the negligent maintenance of public roads. [26] Such activity traditionally has been considered governmental. [27] Hence, there was no right at common law to recover for injury resulting therefrom.

Under the Act, governmental entities performing government functions are immunized from suit under the general grant of immunity contained in section 63–30–3 (1989). [28] However, section 63–30–8 waives immunity for injury caused by a defective, unsafe, or dangerous condition of any state highway. [29] The Act then limits that liability to $250,000 under section 63–30–34(1). Under our statutory scheme, the legislature actually created,

a duty to indemnify, exceeds $250,000 for one person in any one occurrence, or $500,000 for two or more persons in any one occurrence, the court shall reduce the judgment to that amount, regardless of whether ... the function giving rise to the injury is characterized as governmental.

21. 775 P.2d 348 (Utah 1989).

22. Those sections are the right to a jury trial (section 7), the due process clause (section 10), the open courts clause (section 11), and the uniform operation of laws clause (section 24).

23. *Condemarin*, 775 P.2d at 351–52.

24. *Id.*

25. *Id.* at 358; *id.* at 368 (Zimmerman, J., concurring in part); *id.* at 370, 372–73 (Stewart, J., concurring). The three justices comprising the majority disagreed as to the correct state constitutional analysis to apply to the damage recovery statute. Justice Durham found it wanting under both a due process and an equal protection analysis, *id.* at 352–66, Justice Zimmerman joined her only as to due process, *id.* at 366, and Justice

Stewart concurred only as to equal protection, *id.* at 369.

26. *Richards v. Leavitt*, 716 P.2d 276, 277 (Utah 1985) (per curiam); *Sears v. Southworth*, 563 P.2d 192, 193 (Utah 1977); *Niblock v. Salt Lake City*, 100 Utah 573, 577, 111 P.2d 800, 802 (1941); *Campbell Bldg. Co. v. State Road Comm'n*, 95 Utah 242, 70 P.2d 857 (1937); *Hurley v. Town of Bingham*, 63 Utah 589, 594, 228 P. 213, 215 (1924); *see also* Fleming James, Jr., *Tort Liability of Governmental Units and Their Officers*, 22 U.Chi.L.Rev. 610, 630 (1955).

27. *Richards*, 716 P.2d at 277; *Sears*, 563 P.2d at 193.

28. *See Ledfors v. Emery County Sch. Dist.*, 849 P.2d 1162, 1164 (Utah 1993).

29. Section 63–30–8 states:

Immunity from suit of all governmental entities is waived for any injury caused by a defective, unsafe, or dangerous condition of any highway, road, street, alley, crosswalk, sidewalk, culvert, tunnel, bridge, viaduct, or other structure located thereon.

**48**

rather than abrogated, a limited right of recovery against the state for negligent maintenance of its roadways.

We find no constitutional infirmity with the Act as applied to the facts of this case. Because no right existed at common law to recover from the state for injuries arising out of the state's maintenance of public roadways, the legislature is free to limit the state's liability in that area without implicating the open courts clause and its concomitant heightened scrutiny. Maintaining public highways has always been a governmental function, and as Justice Durham stated in the lead opinion in *Condemarin,* "[T]here is no fundamental right to recover unlimited damages from government entities performing governmental functions."[30]

 As the trial court correctly noted, McCorvey's contentions must be considered in light of the presumption of constitutionality afforded legislative acts.[31] If a statute does not impinge on a fundamental or specifically protected interest, the legislation's opponent has the burden of proving unconstitutionality.[32] In this case, McCorvey has failed to meet his burden of proving that the cap, which does not infringe on a fundamental right, is unconstitutional as applied to him. The trial court's order reducing UDOT's damages to the statutory limit under section 63-30-34(1) is therefore affirmed.

Affirmed.

HOWE, Associate C.J., concurs.

ZIMMERMAN, J., concurs in the result.

STEWART, Justice, concurring and dissenting:

I concur in parts I, II, and III of the majority opinion, but dissent with respect to the majority's holding that the statutory damages cap is constitutional under the Utah Constitution.

The Court holds that there is no "fundamental right" to recover damages from government entities performing governmental functions and therefore a heightened standard of scrutiny is not applicable for determining the constitutionality of Utah Code Ann. § 63-30-34(1), which limits recovery for personal injuries against a government entity to $250,000. On that basis, the majority holds that § 63-30-34(1) does not violate Article I, section 24 of the Utah Constitution. While I agree that Article I, section 11 does not guarantee a right to sue the state when it performs a governmental function, Article I, section 24 still applies, and the least restrictive standard of judicial scrutiny governs the determination of whether the cap on damages is constitutional.

Article I, section 24 of the Utah Constitution states, "All laws of a general nature shall have uniform operation." The principle that "persons similarly situated should be treated similarly, and persons in different circumstances should not be treated as if their circumstances were the same," *Malan v. Lewis,* 693 P.2d 661, 699 (Utah 1984), is so fundamental to Utah law that Article I, section 2 of the Utah Constitution declares that an integral purpose of a free government is to ensure the equal protection of the law to the people.

The test for determining whether "laws of a general nature ... have uniform application" is twofold. "First, a law must apply equally to all persons within a class. Second, the statutory classifications and the different treatment given the classes must be based on differences that have a reasonable tendency to further the objectives of the statute." *Id.* at 670 (citations omitted). Whether a law operates uniformly under Article I, section 24 is a judicial question. *See id.* at 671.

The damages cap applies only to lawsuits against the government, not to lawsuits

---

**30.** 775 P.2d at 352; *see also id.* at 383 & n. 51 (Hall, C.J., dissenting, joined by Howe, Assoc. C.J.).

**31.** *Mountain States Tel. & Tel. Co. v. Garfield County,* 811 P.2d 184, 187 (Utah 1991); *Condemarin,* 775 P.2d at 376 (Hall, C.J., dissenting, joined by Howe, Assoc. C.J.); *City of West Jordan*

*v. State Retirement Bd.,* 767 P.2d 530, 532 (Utah 1988).

**32.** *State v. Rio Vista Oil, Ltd.,* 786 P.2d 1343, 1350 (Utah 1990); *Condemarin,* 775 P.2d at 377 (Hall, C.J., dissenting, joined by Howe, Assoc. C.J.); *City of West Jordan,* 767 P.2d at 537.

against any other defendant, whether a person, a corporation, or another entity. For legal purposes, persons injured by the negligence of another are indistinguishable and constitute but one class. Because the damages cap applies only to persons injured by the state, the cap operates in a nonuniform or discriminatory fashion. *Condemarin v. University Hosp.*, 775 P.2d 348 *passim* (Utah 1989).

As stated, the right to sue the state when it performs a governmental function, as constitutionally defined, does not implicate a right protected by the open courts provision of Article I, section 11. *See Madsen v. Borthick*, 658 P.2d 627, 629 (Utah 1983); *Condemarin v. University Hosp.*, 775 P.2d 348 *passim* (Utah 1989). Thus, although a heightened scrutiny standard of judicial analysis does not govern the Article I, section 24 analysis, the rational basis standard of scrutiny does. *See generally Greenwood v. City of North Salt Lake*, 817 P.2d 816, 821 (Utah 1991); *Mountain Fuel Supply Co. v. Salt Lake City Corp.*, 752 P.2d 884, 887–88 (Utah 1988); *J.J.N.P. Co. v. State*, 655 P.2d 1133, 1137 (Utah 1982). That standard, although broad and permissive, is not so flaccid that it requires the court to sustain all discriminations, no matter how invidious. Indeed, this Court has held statutes violative of Article I, section 24 under a rational basis test on a number of occasions. *See, e.g., State Tax Comm'n v. Department of Fin.*, 576 P.2d 1297, 1299 (Utah 1978); *Weber Basin Home Builders Ass'n v. Roy City*, 26 Utah 2d 215, 219, 487 P.2d 866, 869 (1971); *Dodge Town, Inc. v. Romney*, 25 Utah 2d 267, 269, 480 P.2d 461, 462 (1971); *Gronlund v. Salt Lake City*, 113 Utah 284, 292–93, 194 P.2d 464, 468 (1948).

In my view, the cap on damages constitutes an invidious discrimination that violates Article I, section 24. The statute discriminates in two ways: First, as to those injured by negligence, it discriminates against those injured by the state; second, as to those negligently injured by the state, it discriminates between those who are seriously injured and those who are not. Those who are seriously injured may not fully recover, while those who are not seriously injured may.

I submit that the damages cap cannot properly be justified on the ground that it protects the state treasury from potential liabilities that might threaten the delivery of government services. Although the state clearly has the right, and even a duty, to protect itself from such liabilities, and although the damages cap is designed to further that goal, it does so in such a marginal way as to be unreasonable. Certainly one can kill a gnat with a sledgehammer, but that does not make a sledgehammer a reasonable means of killing gnats. The state has many other reasonable ways to protect the treasury from an unduly burdensome drain on it. The discriminatory classification imposed by the damages cap unreasonably produces harsh results with respect to a few people. That consequence of the statute is the antithesis of equal protection of the law.

All persons and private organizations in this state are liable for damages when they negligently injure others, and they too could argue that assuming financial responsibility for the injuries they cause threatens their viability. Nevertheless, individuals and private organizations find ways to handle the costs of their negligence. I fail to see why the state cannot do the same. The state can protect itself through means that would cost little or nothing more than that required of all other persons and organizations. The state's arguments to the contrary have little weight in light of UDOT's requirement that those with whom it contracts must procure liability insurance. In this case, the contractor had six million dollars of liability coverage. If private contractors can assume the cost of such insurance, surely the state can. There is no basis for assuming that if the state were to pay full damages to those few individuals who are seriously injured by its negligent maintenance or construction of public roads, the state's solvency would be threatened or that it would be unable to provide important governmental services.

In her opinion in *Condemarin v. University Hospital*, 775 P.2d 348 (Utah 1989), Justice Durham pointed to the injustice of placing the entire burden of protecting the public treasury on a few individuals who suffer seri-

ous injuries at the hands of state negligence. She quoted from the dissenting opinion in *Fein v. Permanente Medical Group*, 38 Cal.3d 137, 211 Cal.Rptr. 368, 388, 695 P.2d 665, 684 (1985) (en banc), which upheld a damages cap on noneconomic damages for medical malpractice. In that case, Chief Justice Bird of the California Supreme Court observed:

> "Millions of healthcare consumers stand to gain from whatever savings the limit produces. Yet, the entire burden of paying for this benefit is concentrated on a handful of badly injured victims—fewer than 15 in the year MICRA was enacted. Although the Legislature normally enjoys wide latitude in distributing the burdens of personal injuries, *the singling out of such a minuscule and vulnerable group violates even the most undemanding standard of underinclusiveness.*"

*Condemarin*, 775 P.2d at 355 (citations omitted) (emphasis added) (quoting *Fein*, 695 P.2d at 691–92 (Bird, C.J., dissenting)).

The Court's holding that the damages cap does not unconstitutionally discriminate cannot be justified on the ground that if the Legislature bestows a privilege it is not obligated to bestow—in this case the statutory right to sue the state—the Legislature may impose any limitation or condition it chooses on the exercise of that privilege. That notion seems to underlie the majority's statement that "[u]nder our statutory scheme, the legislature actually created, rather than abrogated, a limited right of recovery against the state for negligent maintenance of its roadways."

Even if the Legislature can withhold the privilege or right to sue the state without infringing on the constitution, the Legislature cannot grant that privilege on any condition that it wishes to impose. The majority's proposition to the contrary violates the fundamental principle that our government is limited in the exercise of its powers by those rights and limitations embedded in our Constitution. If the Legislature may impose any condition it chooses on a "privilege" that it may grant or deny, such as business licenses, leases of state land, etc., then it could allow men to recover full damages from the state for injuries arising out of negligent maintenance of the public highways, but allow women to recover only part of the damages they suffer. The Legislature could also grant residents of only some counties the right to a full recovery and deny that right to residents of other counties; and it could discriminate in granting a right to damages for injuries negligently caused by the state on the basis of a plaintiff's age, ancestry, or employment.

The damages cap in this case invidiously discriminates against a few individuals who suffer devastating injuries. The proposition that the state's ability to finance necessary or important functions would be jeopardized by allowing full recovery does not justify the discrimination. The state has a number of other means for protecting the treasury that do not require a few seriously injured persons to bear that entire financial burden.

DURHAM, J., concurs in the concurring and dissenting opinion of STEWART, J.