**2023 UT App 52**

### THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
CODY BLAIR MURRAY,
Appellant.

Opinion
No. 20200890-CA
Filed May 18, 2023

Second District Court, Ogden Department
The Honorable Joseph M. Bean
No. 191902454

Emily Adams, Freyja Johnson, and Cherise Bacalski,
Attorneys for Appellant

Sean D. Reyes and William M. Hains,
Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES GREGORY K. ORME and MICHELE M. CHRISTIANSEN
FORSTER concurred.

TENNEY, Judge:

¶1     After Cody Murray pleaded guilty to violating a protective
order, the district court ordered him to pay the victim's moving
expenses and 12 weeks of lost wages as restitution. Murray now
appeals that restitution order, arguing that his criminal conduct
did not proximately cause either of those losses. On the moving
expenses, we agree with Murray and reverse that portion of the
order. On the lost wages, however, we conclude that there was
sufficient evidence to link Murray's criminal conduct to the
claimed loss. We accordingly affirm that portion of the order.

BACKGROUND

¶2    Murray married C.M. in March 2018, and they lived together throughout their short marriage. On January 2 or 3, 2019, C.M. filed a report with law enforcement alleging that Murray had engaged in sexual intercourse with her without her consent while she was medicated and sleeping. On the same day that she filed this report, C.M. obtained a temporary protective order against Murray based on this same allegation.

¶3    On January 3, 2019, law enforcement served Murray with the protective order at the residence he shared with C.M., and Murray complied with the order by packing his belongings and leaving the residence. Within an hour of leaving, however, Murray asked a friend to contact C.M. on his behalf. As subsequently alleged in a probable cause affidavit, C.M. soon received "phone calls and text messages" from the friend's phone in which the friend relayed messages that Murray "loved her" and "missed her." As also alleged, while the friend was on the phone speaking to C.M., Murray "passed a paper note" to the friend asking him "to let C.M. know that [Murray] was scared." C.M. reported these communications to law enforcement as a violation of the protective order.

¶4    The State later filed two cases against Murray. The two cases were filed separately and were not consolidated. In the first case, the State charged Murray with one count of rape. That charge was based on C.M.'s allegation that Murray had sexual intercourse with her without her consent while she was sleeping. That case was later dismissed.

¶5    In the second case, which is the case at issue in this appeal, the State charged Murray with one count of violating a protective order. *See* Utah Code § 76-5-108 (2018). This charge was based on Murray's indirect communications with C.M. on January 3, 2019. In March 2020, Murray pleaded guilty to the charged offense. As

a result of a plea deal, the charge was reduced from a class A misdemeanor to a class B misdemeanor. In his affidavit in support of the plea, Murray admitted that "[o]n or about January 3, 2019," he "knowingly and intentionally communicate[d] with C.M. through a mutual friend . . . through phone calls and text messages." Murray also agreed that he "may be ordered to make restitution to any victims of [his] crimes."

¶6 Murray agreed to be sentenced at that same hearing. During the sentencing portion of the hearing, C.M.'s attorney asked the court to leave open C.M.'s restitution claim for the "one year statutory time limit," informing the court that she would "submit any restitution" after receiving further documentation. The court left C.M.'s restitution claim open as requested.

¶7 In July 2020, the Utah Office of Victims of Crime (UOVC) filed a motion for restitution, asserting that it had paid C.M. a total of $6,264.47.[1] Of that amount, $5,520.28 was designated as reimbursement for "[l]oss of wages" and $744.19 was designated as reimbursement for "[r]elocation."

¶8 Murray objected to UOVC's motion for restitution and requested a hearing. At that hearing, UOVC's attorney called two witnesses: (1) a representative from UOVC (Representative) and (2) C.M.

¶9 Representative testified that UOVC received C.M.'s application for restitution in November 2019. Representative testified that C.M. listed both the protective order violation and the alleged rape as the bases for her restitution claim. Representative further noted that in reviewing C.M.'s restitution claim, "the reparations officer indicated that the claim was approved based on both incidents"—the alleged rape *and* the

---

1. UOVC was represented by an attorney from the Utah Attorney General's office who serves as "agency counsel" for UOVC.

protective order violation—because "they were so close together" that "the reparations officer couldn't separate them into two separate claims."

¶10 Representative testified that UOVC ultimately approved and paid C.M.'s expenses for "loss of wages" in the amount of $5,520.28, as well as "relocation" or moving expenses in the amount of $744.19, thus totaling $6,264.47. With respect to the lost wages claim, Representative testified that UOVC received a document from C.M.'s employer that explained "how much [C.M.] made at the time and how long she was out of work." Representative said that UOVC also received a "health provider statement" that corroborated that C.M. missed work. Representative further said that from these documents and other verification efforts with C.M.'s employer, UOVC determined that C.M. missed "over 68 days" of work, and that it had then paid "12 weeks of lost wages" for the work C.M. missed from "January 3rd of 2019 through March 15th of 2020" at "[s]ixty-six percent of the full-time salary," which in C.M.'s case amounted to $5,520.28.

¶11 With respect to the moving expenses, Representative testified that UOVC paid C.M. $744.19 to cover "reimbursement for movers." Representative said that C.M. told UOVC that she had moved because "she didn't feel comfortable in having [Murray] know where she lived."

¶12 UOVC's attorney then called C.M., who testified that she obtained the protective order against Murray because of the "actions he was making to [her] in [her] sleep." C.M. also provided and referred to a note from a doctor indicating that C.M. had been seen because "[f]or the duration of her marriage her husband was sexually assaulting her in her sleep," "[s]he was experiencing UTIs on many occasions from the sexual abuse," and she had "[m]ajor depressive disorder" and "post-traumatic stress disorder."

¶13 During C.M.'s testimony, UOVC's attorney asked, "[A]s a result of the violation of the protective order, can you tell us what effect the violation of the protective order, the conduct that the defendant caused—what happened to you as a result?" C.M. responded that she suffered "severe panic attacks" and flashbacks, "live[d] in fear nearly every day," felt a "[l]oss of trust of people in general," and had "a hard time concentrating or focusing." She said she had "severe depression" and was simply not "able to function like [she had] always been able to."

¶14 UOVC's attorney then asked if Murray's conduct "in December or January of 2018, '19 . . . interfere[d] with [her] ability to interact with people," to which C.M. responded, "Definitely." C.M. testified that because these issues "interfere[d] with [her] ability to work," there were times where she had to take leave from work. She testified that the "very first time" she "took leave was for a doctor's appointment . . . back in December of 2018" and that she was out of work periodically after that, thus agreeing with the suggestion from the attorney that she missed work "every few days, a couple hours here, a few hours there, a full day here, a few days there" until March 2020, when she was "out of work altogether and couldn't work at all." UOVC's attorney asked if C.M.'s requests to take leave from work starting in "December of 2018" were "related to [Murray's] conduct . . . that was occurring at that time," and C.M. responded, "It was."

¶15 With respect to the moving expenses, C.M. testified that she moved from the home she'd shared with Murray because the divorce decree ordered her to sell it. C.M. said that she moved in May 2020—17 months after Murray violated the protective order—and that her restitution request was based on the movers she had hired to assist with that move.

¶16 Murray didn't call any witnesses at the restitution hearing. Instead, after UOVC's attorney rested, each side presented closing arguments. UOVC's attorney asked the court to order restitution

for lost wages because C.M. had to take leave from work "[a]s a result of [Murray's] conduct . . . because she wasn't able to fully perform the job." UOVC's attorney asked for restitution for moving expenses because "it was [Murray's] conduct which caused" C.M. to move and she "had reason to hide her whereabouts from" Murray out of fear.

¶17 Murray, however, argued that under the restitution statute, "restitution has to be tied directly" to the offense for which he'd been convicted—which, here, was a class B misdemeanor violation of a protective order. In Murray's view, restitution for the lost wages was not appropriate because C.M. "missing all of [that] work . . . [could not] be tied" to his violation of the protective order (as opposed to the underlying rape allegation that the protective order was based on). Murray also argued that the moving expenses could not be tied to this conviction because C.M.'s decision to move was based on an order from the divorce decree requiring C.M. and Murray to sell the house.

¶18 At the close of arguments, the court ordered restitution in the amount of $6,264.47 to cover lost wages and moving expenses. In its oral ruling, the court noted that Murray was "alleged to have committed sexual offenses against [C.M.] in her sleep" in the latter part of 2018. The court said that it would "take the testimony of the witness at face value with regard to what she felt was a violation that caused the fear," and the court then found that Murray's "past history" of "sexual[ly] assaulting" C.M. "in her sleep" caused her "fear" and "anxiety." With respect to C.M.'s missed work, the court found that "whatever happened, certainly enhanced or contributed to [C.M.'s] anxiety, depression, [and] fear," and that "after the circumstances giving rise to whatever happened in December, there was a definite downturn with regard to [C.M.'s] ability . . . to work." And with respect to the moving expenses, the court found that the "moving expenses [were] also reasonable and arising out of the crime that occurred."

¶19    Murray objected to the court's ruling. Murray argued that the court could "only tie restitution to what [Murray] was convicted of or pled guilty to, which would be the violation of the protective order," and he further argued that the court should not "consider any of the alleged sexual misconduct" in its determination of restitution. In response, the court referred to the document submitted by C.M. in her restitution application, noting that "for the duration of the marriage, [Murray] was sexually assaulting [C.M.] in her sleep" and that she "was experiencing UTIs on many occasions from the sexual abuse." The court observed that C.M. suffered from depression and post-traumatic stress as a result. Of note, the court then wondered whether these conditions were "exacerbated . . . or caused by a violation of a protective order," "especially the loss of work *after* his commission of the violation of the protective order." (Emphasis added.)

¶20    In a subsequent written restitution order, the court ordered Murray to pay UOVC a total of $6,264.47 for lost wages and moving expenses. In its Findings of Fact, the court found that C.M. "suffered emotional trauma as a result of [Murray's] conduct in this case" and that her "fear, anxiety, and depression . . . rendered [her] unable to perform her duties and required her to miss work." The court found that the trauma C.M. suffered "also caused her to relocate because she feared [Murray] and didn't want him to know where she lived." Murray filed a timely notice of appeal from that judgment.[2]

---

2. In between the court's oral and written rulings, Murray filed a motion to reconsider. But after the written ruling was entered, Murray filed a timely notice of appeal. Despite the fact that this notice of appeal had been filed, and over an objection from UOVC, the district court subsequently held oral argument on Murray's motion to reconsider, after which it denied the motion.

(continued…)

ISSUE AND STANDARDS OF REVIEW

¶21 Murray argues that the district court improperly ordered restitution for C.M.'s lost wages and moving expenses. "We will not disturb a district court's restitution determination unless the court exceeds the authority prescribed by law or abuses its discretion." *State v. Calata*, 2022 UT App 127, ¶ 12, 521 P.3d 920 (quotation simplified), *cert. denied*, 525 P.3d 1268 (Utah 2023). "To the extent that the district court made legal determinations in connection with its restitution analysis, we review those legal determinations for correctness." *State v. Oliver*, 2018 UT App 101, ¶ 15, 427 P.3d 495 (quotation simplified). But when "a defendant argues that the evidence was insufficient to support a restitution order, the defendant must demonstrate that the clear weight of

---

On appeal, both parties now agree that Murray's notice of appeal divested the district court of jurisdiction to rule on the motion to reconsider. We agree with the parties. Because the motion to reconsider was filed before the written ruling, it was a *prejudgment* motion to reconsider the oral ruling. While the court was "free to consider" what was essentially a request for "reargument" at "any time before entering the final judgment," *Gillett v. Price*, 2006 UT 24, ¶ 7 n.2, 135 P.3d 861, the court did not do so. Instead, it issued the written final judgment. When Murray then filed his notice of appeal after that final judgment had been entered, his notice of appeal "divest[ed] the district court of jurisdiction." *Garver v. Rosenberg*, 2014 UT 42, ¶ 11, 347 P.3d 380. Of note, our supreme court has held that a prejudgment motion to reconsider does "not toll the time for appeal once a final judgment [is] entered." *Gillett*, 2006 UT 24, ¶ 7 n.2. We likewise see no basis for holding that a prejudgment motion to reconsider would somehow undermine the finality of a written final judgment or allow the court to retain jurisdiction after a notice of appeal has been filed. As a result, we agree with the parties that the only ruling properly before us is the original restitution order.

the evidence contradicts the court's ruling." *State v. Chadwick*, 2021 UT App 40, ¶ 6, 486 P.3d 90 (quotation simplified).

ANALYSIS

¶22 The Crime Victims Restitution Act (the CVRA) requires the district court "to determine restitution for any pecuniary damages proximately caused by the defendant's criminal conduct." *State v. Blake*, 2022 UT App 104, ¶ 9, 517 P.3d 414. Here, Murray challenges the court's decision ordering him to pay C.M.'s moving expenses and her lost wages. In Murray's view, his criminal conduct did not proximately cause either loss.

¶23 We first quickly dispense with the moving expenses issue. Murray argues that "[n]o evidence tied C.M.'s move from the marital home" to his criminal conduct, but that "the evidence on the record was that C.M. had to move because of the divorce decree." Based on this, Murray argues that there was no basis for requiring him to pay these expenses as part of restitution. In its responsive brief, the State concedes this point. Having reviewed the record, we conclude that Murray's argument and the State's concession are well taken. We accordingly reverse that portion of the restitution order.

¶24 The remaining and principal issue on appeal, then, is whether the court also erred in ordering Murray to pay C.M.'s lost wages. On this, Murray argues that the court erred in two key respects: (I) by taking into account the alleged rape and (II) by then determining that Murray's criminal conduct proximately caused C.M. to miss work. We address each argument in turn.

I. Alleged Rape

¶25 Murray argues that the district court improperly based the restitution order for lost wages on C.M.'s rape allegation, rather

than limiting itself to considering the sole offense to which he had pleaded guilty: violating a protective order. We see no legal error in the court's decision.

¶26　As a general rule, we "apply the law in effect at the time of the occurrence regulated by that law." *State v. Wilkerson*, 2020 UT App 160, ¶ 24, 478 P.3d 1048 (quotation simplified). The version of the restitution statute in effect at the time of Murray's sentencing provided that

> [w]hen a defendant enters into a plea disposition or is convicted of criminal activity that has resulted in pecuniary damages, . . . the court shall order that the defendant make restitution to victims of crime as provided in this chapter, or for conduct for which the defendant has agreed to make restitution as part of a plea disposition.

Utah Code § 77-38a-302(1) (2019); *see also id.* § 77-38a-302(5)(a) (2019) ("For the purpose of determining restitution for an offense, the offense shall include any criminal conduct admitted by the defendant to the sentencing court or for which the defendant agrees to pay restitution.").[3] Under these statutes, Murray therefore could not "be ordered to pay restitution for criminal activities for which he did not admit responsibility, was not convicted, or did not agree to pay restitution." *State v. Randall*, 2019 UT App 120, ¶ 13, 447 P.3d 1232 (quotation simplified).

---

3. The legislature recently amended the CVRA. The most recent version of the statute provides that the "court shall order a defendant, as part of the sentence imposed," to "pay restitution to all victims: (i) in accordance with the terms of any plea agreement in the case; or (ii) for the entire amount of pecuniary damages that are proximately caused to each victim by the criminal conduct of the defendant." Utah Code § 77-38b-205(1)(a) (2023).

¶27 It's true that Murray was not convicted of raping C.M. As noted, the separate criminal case that was based on the rape allegation was dismissed. It's also true that Murray did not admit to raping C.M. in this case either. But contrary to Murray's arguments, this doesn't mean that his alleged sexual misconduct against C.M. could play no role in the court's restitution analysis.

¶28 Again, Murray pleaded guilty to violating a protective order, and the elements of that offense were that Murray was "subject to a protective order" and "intentionally or knowingly violate[d] that order after having been properly served or having been present . . . when the order was issued." Utah Code § 76-5-108(1) (2018). In his plea agreement, Murray acknowledged these elements and agreed that he had "committed the crime." In the factual basis portion of the plea agreement, Murray further agreed that he had "knowingly and intentionally communicate[d] with C.M. through a mutual friend . . . through phone calls and text messages." Pulling this together, the criminal activity for which Murray was convicted (by way of plea) included these key pieces:

- Murray was subject to a protective order;

- Murray intentionally or knowingly violated the protective order; and

- Murray did so by knowingly and intentionally communicating with C.M. through a mutual friend through phone calls and text messages.

¶29 Once Murray was convicted of this offense, the district court could then order restitution for any damages that were "proximately caused" by that offense. *State v. Ogden,* 2018 UT 8,

¶¶ 31–48, 416 P.3d 1132.[4] Our supreme court has explained that restitution is intended "to compensate the victim for pecuniary damages," as well as "to rehabilitate and deter the defendant, and others, from future illegal behavior." *State v. Laycock*, 2009 UT 53, ¶ 18, 214 P.3d 104. Because the question before a restitution court is what damages were proximately caused by the offense, the court isn't confined to just the narrow elements of the offense of conviction. Rather, while the "restitution statute requires that responsibility for the criminal conduct be firmly established, much like a guilty plea, before the court can order restitution," "it is only the initial crime for which liability must be legally certain." *State v. Hight,* 2008 UT App 118, ¶¶ 3, 5, 182 P.3d 922 (quotation simplified). Once guilt for the offense has been firmly established, the court then has "broad discretion, after reviewing the evidence presented at the restitution hearing," to "order restitution for any pecuniary damages clearly resulting from" that offense. *Id.* ¶ 5 (quotation simplified). In other words, once the defendant is convicted of "criminal conduct," the defendant can "be held responsible for *all* damages proximately caused by that conduct." *State v. Huffman*, 2021 UT App 125, ¶ 9, 501 P.3d 564 (emphasis in original), *cert. denied*, 509 P.3d 198 (Utah 2022).

¶30 Our decision in *Huffman* is illustrative. There, the defendant pleaded guilty to possessing drugs. *Id.* ¶ 7. Although the offense of drug possession doesn't include, as an element, the destruction of property, we held that it was appropriate for the

---

4. The version of the statute that governed at the time of Murray's sentencing did not expressly state that restitution could be awarded for damages "proximately caused" by the offense, *see* Utah Code § 77-38a-302(1) (2019), but our supreme court had interpreted that statute as containing such an allowance, *see State v. Ogden*, 2018 UT 8, ¶¶ 31–48, 416 P.3d 1132. The statute has since been amended to expressly incorporate the proximate cause standard. *See* Utah Code § 77-38b-205(1)(a)(ii) (2023).

court to order restitution for damage that was done to the victim's motorhome. This was so because evidence before the court established that the defendant's possession of drugs inside the motorhome proximately caused those damages. *Id.* ¶¶ 12–14.

¶31    A similar dynamic is in play here. Again, Murray pleaded guilty to violating a protective order. In doing so, he acknowledged both the existence of the protective order and that he had violated its terms. Once these things were firmly established through the guilty plea, the court then had broad discretion to order restitution for any damage that was proximately caused by Murray's criminal conduct.

¶32    When making that proximate cause determination, the court had at least some latitude to consider the conduct that had led to the protective order, and this is largely so because of the nature of the offense. After all, Murray wasn't convicted of a crime because he contacted a stranger with whom he had no prior history. Rather, Murray was convicted of intentionally or knowingly contacting a person who had obtained a protective order against him. In this key sense, it was the protective order that made Murray's communications criminal.

¶33    A protective order acts as a "mechanism" for giving victims a measure of "protection against their abusers." *State v. Hardy*, 2002 UT App 244, ¶ 17, 54 P.3d 645; *see also State v. Baize*, 2019 UT App 202, ¶ 20 n.5, 456 P.3d 770. One of the principal ways that a protective order does this is by creating a legal barrier between the victim and the abuser. If a person who is subject to a protective order subsequently breaches that barrier, a court couldn't realistically be expected to decide whether the victim was traumatized by the violative act by considering that act as if it had occurred in a vacuum. Given that the victim had previously obtained judicial protection from the person, the nature of the alleged prior conduct would very likely have some bearing on the interconnected questions of whether and why the illegal contact

had proximately caused any trauma or harm to the victim (not to mention how much damage the victim had actually suffered).

¶34   In short, because Murray pleaded guilty to violating a protective order, the district court could consider the fact that C.M. had obtained a protective order against him as part of its restitution analysis. And from there, it then had discretion to consider the conduct that led to the issuance of the protective order, at least to the extent that such conduct could inform its decision about whether Murray's actions proximately caused any harm to C.M.

## II. Proximate Cause

¶35   Murray next argues that the evidence before the district court was insufficient to show that his criminal conduct proximately caused C.M. to miss 12 weeks of work. We disagree.

¶36   The "proximate cause standard requires a showing that the crime, in a natural and continuous sequence, unbroken by any new cause, produced the injury and that the injury would not have occurred absent the crime." *Blake*, 2022 UT App 104, ¶ 9 (quotation simplified). The "burden is on the State to prove proximate cause," *State v. Morrison*, 2019 UT App 51, ¶ 13, 440 P.3d 942, and this "requires proof of two elements: (1) but-for causation and (2) foreseeable harm," *State v. Watson*, 2021 UT App 37, ¶ 15, 485 P.3d 946.

¶37   Proximate cause is generally a "fact question[] to be resolved by the fact finder." *State v. Barzee*, 2007 UT 95, ¶ 81, 177 P.3d 48; *see also Mackay v. 7-Eleven Sales Corp.*, 2000 UT 15, ¶ 7, 995 P.2d 1233 (noting that proximate cause is a fact question). Because of this, we review a district court's finding of proximate cause for clear error. *State v. Grant*, 2021 UT App 104, ¶¶ 24, 35, 499 P.3d 176, *cert. denied*, 505 P.3d 56 (Utah 2022).

Thus, when "a defendant argues that the evidence was insufficient to support a restitution order, the defendant must demonstrate that the clear weight of the evidence contradicts the court's ruling." *State v. Chadwick*, 2021 UT App 40, ¶ 6, 486 P.3d 90 (quotation simplified).

¶38 Here, we see no clear error in the court's finding that Murray's violation of the protective order proximately caused C.M. to miss 12 weeks of work.

¶39 At the restitution hearing, C.M. testified that she obtained the protective order because of "actions [Murray] was making to [her] in [her] sleep" that began "at the end of December of 2018." She further agreed that this "conduct" was "the reason for the ongoing protective order." Of note, C.M. then testified that, "*as a result of the violation of the protective order*," she has "severe panic attacks," "severe depression," and flashbacks; that she "live[s] in fear nearly every day"; that she has a "[l]oss of trust in people" generally; that she has a "hard time concentrating or focusing"; and that she was unable "to function like [she has] always been able to." (Emphasis added.) When C.M. was then asked whether "the problems" that she was having "interfere[d] with [her] ability to work," she responded, "Definitely." While she said that the "very first time" she "took leave was for a doctor's appointment . . . back in December of 2018" (which would have predated Murray's violation of the protective order), C.M. also agreed that she missed work "every few days, a couple hours here, a few hours there, a full day here, a few days there" until March 2020, when she was "out of work altogether and couldn't work at all." The district court determined that C.M.'s testimony was credible, and on appeal, we give deference to that credibility determination. *See State v. Miles*, 2020 UT App 120, ¶ 34, 472 P.3d 978 (noting that "because of the district court's advantaged position in observing the witnesses firsthand, we defer to its credibility findings" (quotation simplified)); *State v. Taylor*, 2017 UT App 89, ¶ 10, 402 P.3d 790 (noting that "we accord deference

to the trial court's ability and opportunity to evaluate credibility and demeanor" (quotation simplified)).

¶40    As also noted, UOVC introduced evidence showing that C.M. missed "over 68 days" of work, and UOVC's Representative testified that UOVC paid for 12 weeks of work that she missed "span[ning] from January 3rd of 2019 through March 15th of 2020" because that missed work was "related to the incident in this particular case, which is the violation of a protective order." When coupled with C.M.'s testimony about the effects of the protective order violation itself on her psyche and her ability to function, this provided an evidentiary basis for the court to find that Murray's criminal conduct proximately caused C.M. to miss this work.

¶41    Murray nevertheless pushes back on several fronts, none of which are availing.

¶42    First, Murray points to testimony showing that C.M. was traumatized by the alleged rape (as opposed to the protective order violation), as well as testimony establishing that C.M. began missing work even before the unlawful communication. Both things are, on this record, unquestionably true. But even if the alleged rape caused psychological trauma to C.M. on its own, and even if that trauma caused her to miss work (either before or even after January 3, 2019), this doesn't mean that Murray's violation of the protective order couldn't proximately cause her to miss work too.

¶43    Again, if there was sufficient evidence to establish that C.M.'s losses were proximately caused by the communication, then those losses were compensable. The fact that the losses may have been linked to some other causal source does not change this. In civil cases, it has long been recognized that there can be multiple causes for an injury or a trauma. *See, e.g.*, *McCorvey v. Utah State Dep't of Transp.*, 868 P.2d 41, 45 (Utah 1993) (confirming

"there can be more than one proximate cause" of "an injury"); *Steffensen v. Smith's Mgmt. Corp.*, 820 P.2d 482, 486 (Utah Ct. App. 1991) ("There can be more than one proximate cause of an injury so long as each is a concurrent contributing factor in causing the injury." (quotation simplified)). And this is true in a criminal case too. *See, e.g., State v. Gonzales*, 2002 UT App 256, ¶ 21, 56 P.3d 969 ("A defendant's acts may be found to be the proximate cause of the victim's death even if the victim actually died as a result of the combination of the defendant's acts plus some other contributing factor." (quotation simplified)).[5]

¶44   Here, we agree with Murray that C.M.'s trauma and associated anxiety from the violation of the protective order was likely linked in some measure to the alleged rape. As discussed above, however, the alleged rape was the very reason that C.M. had previously obtained a protective order against Murray. And as also discussed, C.M.'s testimony at the restitution hearing supported the conclusion that when Murray contacted her in violation of that order, this both exacerbated her prior trauma *and* caused additional trauma too, thereby further interfering with her ability to work. Given this sworn and court-credited testimony, we cannot conclude that it was against the clear weight of the evidence for the court to conclude that, even accounting for the trauma associated with the alleged rape, the violation of the protective order itself proximately caused C.M. to miss work.

¶45   Second, Murray argues that it could not have been "reasonably foreseeable that C.M. would miss 12 weeks of work" because he sent her "a single indirect text message." As an initial matter, it's unclear from the record if this case really does involve

_____

5. Something somewhat similar can be true outside the proximate cause context too. In *State v. O'Bannon*, 2012 UT App 71, ¶ 38, 274 P.3d 992, for example, we recognized "a basis under Utah law for holding a defendant culpable for causing death even when other factors contributed to the victim's death."

just a single text message. For "the purpose of determining restitution for an offense, the offense shall include any criminal conduct admitted by the defendant to the sentencing court or for which the defendant agrees to pay restitution." Utah Code § 77-38a-302(5)(a) (2019). Here, the probable cause affidavit alleged that C.M. had "received phone calls and text messages" from Murray through their mutual friend. And in his plea affidavit, Murray agreed under oath that he "knowingly and intentionally communicate[d] with C.M. through a mutual friend . . . through phone calls and text messages." On this record, the court could therefore assess the restitution question in light of Murray's admission that there had been multiple communications.

¶46    In any event, whether viewed as multiple communications or even just a single communication, this argument still fails because the effect of the communication(s) can't meaningfully be divorced from the surrounding context. Again, Murray wasn't convicted of sending a message to a stranger with whom he had no prior history. Rather, Murray was convicted because he knowingly or intentionally communicated with C.M. in violation of a protective order. By communicating with C.M. despite the existence of an order from a judge that prohibited him from contacting her, Murray undermined the sense of distance and security that the protective order was intended to give her. Because of this context and history, we disagree with Murray's assertion that it could not have been reasonably foreseeable that C.M. would be traumatized and miss work as a result.

¶47    Finally, Murray argues that the restitution order was at odds with our decision in *State v. Bickley*, 2002 UT App 342, 60 P.3d 582. We disagree. In *Bickley*, the defendant was charged with criminal nonsupport, and the "Amended Information listed the nonpayment period from February 1, 1997 to January 10, 2000." *Id.* ¶ 3. After the defendant pleaded guilty to this offense,

however, the district court awarded restitution for arrears that occurred prior to 1997. *Id.* ¶¶ 3–4. We reversed that decision on appeal, concluding that the court could not impose restitution for pre-1997 arrears "without making inferences." *Id.* ¶ 12 (quotation simplified). Because of this, we held that it was not "firmly established" that the defendant was in fact responsible for the pre-1997 arrears. *Id.*

¶48 *Bickley* is readily distinguishable. The arrears at issue in *Bickley* plainly fell outside the conviction (which, again, was specifically limited to arrears that occurred from February 1997 on). As discussed above, however, the offense at issue here was the violation of a protective order, and that protective order was by definition linked to some prior conduct. Thus, unlike *Bickley*, it's not at all clear that this restitution order was based on damages that fell outside of the offense at issue. In addition, there's no suggestion that the district court in *Bickley* based its restitution award for the pre-1997 arrears on any evidence or testimony. *Id.* ¶¶ 2–4, 12. This is why we faulted the court for "making inferences" and imposing restitution for arrears that were not "firmly established." *Id.* ¶ 12 (quotation simplified). But again, this was not the case here, where the restitution order was based on sworn testimony from the hearing itself.

¶49 In short, we can overturn the court's proximate cause determination only if Murray has established "that the clear weight of the evidence contradicts the court's ruling." *Chadwick*, 2021 UT App 40, ¶ 6 (quotation simplified). Having reviewed the record, we conclude that C.M.'s testimony about the effects of the protective order violation on her psyche and her ability to function, coupled with the evidence presented by UOVC about the days that she missed at work, was sufficient to support the court's finding that Murray's criminal conduct proximately caused C.M. to miss this work, thereby causing these damages. Because the court's ruling was not against the clear weight of the evidence before it, we affirm that determination.

CONCLUSION

¶50    The district court erred when it required Murray to pay $744.19 in restitution for moving expenses. We accordingly vacate that portion of the court's order. But the court did not err when it ordered restitution in the amount of $5,520.28 for lost wages. We accordingly affirm the restitution award of $5,520.28 for lost wages.

————