2021 UT App 37

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MALVIN WATSON,
Appellant.

Opinion
No. 20190828-CA
Filed April 1, 2021

Third District Court, Salt Lake Department
The Honorable Mark S. Kouris
No. 181905609

Nathalie S. Skibine and Melissa Stirba, Attorneys
for Appellant

Sean D. Reyes and Kris C. Leonard, Attorneys
for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JILL M. POHLMAN concurred.

ORME, Judge:

¶1     Malvin Watson appeals from the district court's restitution order. He contends, in relevant part, that the State did not meet its burden of establishing that his bizarre road rage perpetrated against another driver (Victim) proximately caused Victim's need for mental health therapy. Without sympathy for Watson, we do agree with his legal position and therefore vacate the restitution order.

## BACKGROUND[1]

¶2 On April 27, 2018, Victim left for the gym in her "little four-door" vehicle. During the drive, Victim noticed Watson's SUV "way behind" her and proceeded to merge into the same lane. Watson disagreed with Victim's assessment of the distance between their two vehicles, instead believing that she had cut him off. Overcome by road rage, Watson began acting as if he were going to hit Victim's vehicle by repeatedly speeding up behind her and then suddenly braking. In response, Victim changed back into her original lane. Instead of getting on with his life, Watson followed Victim, and Victim observed (but could not hear) him screaming as he continually attempted to force her off the road by swerving his car toward hers.

¶3 Attempting once more to "get out of his way" and lose him, Victim sped up and made a right-hand turn at the next intersection. Watson pursued, charged at her at "full speed," struck her from behind, and then left the scene by making a U-turn.

¶4 Victim followed Watson to obtain his license plate number. When Watson realized that Victim was behind him, he hit his brakes and got out of his SUV. He approached Victim, who had also exited her vehicle, and he began threatening to "slam [her] head into the fucking car," called her various derogatory terms, and tried to grab her. Victim ran into the road and attempted to flag down passing vehicles for assistance.

---

1. Our recitation of the facts is taken from the record of Watson's trial and restitution hearing. Concerning the facts giving rise to Watson's convictions, "we review the record facts in a light most favorable to the jury's verdict and recite [them] accordingly." *State v. Liti*, 2015 UT App 186, ¶ 3 n.2, 355 P.3d 1078 (quotation simplified).

Watson was "still coming at [her]," so Victim ran back to the sidewalk and tried to use her vehicle "as a shield" to keep Watson away. Because Watson kept trying to go around the car to get to her, Victim ran into a neighborhood with the aim of knocking on a door for help. Watson was undeterred and followed Victim into the neighborhood.

¶5     Fortunately, a man (Bystander 1) and his cousin (Bystander 2) observed the confrontation between Watson, whom they described as "a big man," and Victim, whom they described as "a small young lady," from Bystander 1's driveway. They witnessed Watson push Victim and decided to intervene. As the two approached, Bystander 2 called out, "Hey, you don't hit a woman." Watson then pulled out a pocketknife.

¶6     A man (Bystander 3) who was driving by made a U-turn in response to Victim's earlier attempt to flag down passing vehicles and pulled up on the scene. Bystander 3 shouted at Watson, whose attention at the time was directed toward Bystander 1 and Bystander 2, and Watson then began approaching Bystander 3. One of the two other men warned Bystander 3 that Watson was in possession of a knife, so Bystander 3 retrieved his firearm and instructed a passenger in his vehicle to call the police. At that point, the situation deescalated, and Watson walked back to his SUV, stating that he was "going to move it up just a little bit." Bystander 2 followed Watson in his own vehicle, and the two pulled over approximately three blocks away and waited for police officers to arrive.

¶7     For his conduct toward Victim, the State charged Watson with one count each of assault and reckless driving, class B misdemeanors, and one count of following too closely, an

infraction.[2] Following a trial, the jury convicted Watson of those charges, and the district court sentenced him to a suspended jail sentence and twelve months of probation.[3] The court also ordered Watson, "subject to [his] objection," to pay $1,980[4] plus interest in restitution to the Utah Office for Victims of Crime (UOVC), which represented the amount UOVC had paid for mental health therapy sessions for Victim. *See* Utah Code Ann. § 63M-7-519 (LexisNexis 2016).

¶8      Watson objected to the restitution order and requested a hearing on the matter. *See id.* § 77-38a-302(4) (Supp. 2020).[5] At the hearing, the State presented a list of the 25 mental health therapy sessions UOVC had paid on Victim's behalf. The list provided the date of each session, ranging between June 12, 2018, and May 1, 2019, and the amount paid for each session. The list did not include provider information other than to

---

2. The State also charged Watson with three counts of aggravated assault, third-degree felonies, for his conduct toward Bystander 1, Bystander 2, and Bystander 3. Watson successfully argued at trial that he pulled out the pocketknife in self-defense, and the jury acquitted him of those charges.

3. The State has since sought to have Watson's probation revoked and the jail sentence reinstated because of new charges against him, including aggravated assault.

4. The district court originally ordered Watson to pay $1,910 in restitution, but this figure later increased to $1,980 because UOVC made an additional payment on Victim's behalf during the time between the original order and the restitution hearing.

5. Because the applicable provisions of the Utah Code in effect at the relevant time do not materially differ from those currently in effect, we cite the current version of the code for convenience.

simply note "Mental Health Therapy" under that column, and it did not include information regarding the topics addressed in each session or the treatment plan. There was also no indication whether Victim had a prior counseling relationship with the provider.

¶9    The State also presented testimony from the UOVC restitution specialist (Restitution Specialist) who prepared the list. Her familiarity with this case was limited to her preparation of the list upon the State's request, and she stated she did not "remember any details about it." Restitution Specialist did, however, testify concerning UOVC's standard procedure. She explained that when UOVC receives a request for payment from a victim, a claims analyst will "review each invoice that comes in for crime relatedness" and will authorize payment only if the claims analyst determines that the claim "is related to the specific crime." Regarding mental health treatment, Restitution Specialist testified that UOVC "require[s] a mental health treatment plan to be filled out by the therapist that [the victim would] like to go to" and will authorize payment only if the plan indicates that the victim's need for therapy "is crime related or that it is therapy that they're attending because of this traumatic incident that they had." If the foregoing requirements are met, UOVC will "automatically" approve 25 therapy sessions for a primary victim and will pay a maximum of $300 for the initial session and a maximum of $70 for each of the remaining 24 sessions.

¶10    Here, a claims analyst, and not Restitution Specialist, had reviewed Victim's treatment plan. Accordingly, Restitution Specialist could not testify to Victim's specific treatment plan or vouch for its crime-relatedness. Instead, she could only testify that as a matter of standard procedure, there must have been a treatment plan that the claims analyst approved prior to authorizing payment. Restitution Specialist also testified that a claims analyst reviews each treatment invoice for

crime-relatedness before authorizing payment. In this case, UOVC did not request progress notes for Victim, which it typically does only if the invoices contain questionable medical codes. Against this backdrop, Restitution Specialist conceded that it was possible for Victim to have discussed issues in therapy that were unrelated to the crimes Watson perpetrated against her.

¶11 Watson objected to the restitution amount, arguing, among other things, that the State did not establish the requisite causation. He asserted, in relevant part, that UOVC approved the maximum benefit of 25 therapy sessions without proof that each session was proximately caused by the crimes. The district court rejected Watson's arguments, holding that Watson's actions "absolutely caused" Victim's need for therapy. Accordingly, the court ordered Watson to pay $1,980 to UOVC in restitution. Watson appeals.

ISSUE AND STANDARD OF REVIEW

¶12 Watson challenges the district court's order that he reimburse UOVC for Victim's mental health therapy sessions on the ground that the State failed to present sufficient evidence to establish proximate cause.[6] "We will not disturb a district court's restitution determination unless the court exceeds the authority prescribed by law or abuses its discretion." *State v. Ogden*, 2018 UT 8, ¶ 25, 416 P.3d 1132 (quotation simplified).

---

6. Watson raises additional challenges to the district court's restitution order. But because we vacate the court's order based on the State's failure to establish proximate cause, we need not address these additional arguments.

ANALYSIS

¶13    At an intuitive level, the district court's belief that Watson's actions "absolutely caused" Victim's need for therapy rings true. And it should be pointed out that Victim received mental health services that were paid for by UOVC. The only issue in this appeal is whether the State properly established that those costs should be shifted from UOVC to Watson.

¶14    The Crime Victims Restitution Act requires district courts to order restitution "[w]hen a defendant enters into a plea disposition or is convicted of criminal activity that has resulted in pecuniary damages." Utah Code Ann. § 77-38a-302(1) (LexisNexis Supp. 2020). The act defines pecuniary damages as "all demonstrable economic injury, whether or not yet incurred, including those which a person could recover in a civil action arising out of the facts or events constituting the defendant's criminal activities," including "medical and other expenses" but not "punitive or exemplary damages and pain and suffering." *Id.* § 77-38a-102(7).

¶15    Furthermore, "[a] trial court's restitution award must rely on a sufficient evidentiary basis," *State v. Ogden*, 2018 UT 8, ¶ 52, 416 P.3d 1132, and it may award restitution "only in cases where liability is clear as a matter of law and where the commission of the crime clearly establishes causality of the injury or damages," *State v. Becker*, 2018 UT App 81, ¶ 17, 427 P.3d 306 (quotation simplified). Our Supreme Court has clarified that the standard of causation under the act is that of proximate cause. *See Ogden*, 2018 UT 8, ¶¶ 39, 48. "Proximate cause is that cause which, in a natural and continuous sequence, unbroken by any new cause, produced the injury, and without which the injury would not have occurred." *Becker*, 2018 UT App 81, ¶ 13 (quotation simplified). It requires proof of two elements: (1) but-for causation and (2) foreseeable harm. *State v. Randall*, 2019 UT App 120, ¶ 20, 447 P.3d 1232. "In restitution cases, the burden is on

the State to prove proximate cause." *State v. Morrison*, 2019 UT App 51, ¶ 13, 440 P.3d 942.

¶16 Here, Watson argues that insufficient evidence supported the district court's restitution order. He argues, among other things, that UOVC's decision to pay for Victim's mental health therapy and Restitution Specialist's testimony regarding UOVC's general procedures were insufficient to establish that his criminal conduct proximately caused Victim's need for 25 therapy sessions. While we do not doubt that Watson's violent behavior could readily lead to Victim's need for mental health services to address the trauma she suffered as a result of his conduct, we agree that the State did not prove its case for restitution.

¶17 Even in cases where UOVC compensates a victim, the State still bears the burden of proving "that the victim has suffered economic injury and that the injury arose out of the defendant's criminal activities." *Becker*, 2018 UT App 81, ¶¶ 12, 14 (quotation simplified). The State asserts that "[t]estimony from [Restitution Specialist] showed that the therapy sessions in this case must have involved crime-related mental health problems because the therapist had to comply with the UOVC procedures and, therefore, necessarily provided invoices showing crime-relatedness before they were authorized for payment." Restitution Specialist testified that UOVC authorizes payment on a victim's behalf so long as the claims analyst determines that the treatment plan and subsequent invoices indicate that the requested treatment "is crime related." *See* Utah Admin. Code R270-1-14(2) ("Awards will only be granted for costs the reparations officer determines are directly related to or resulting from criminally injurious conduct."). But mere "crime-relatedness" falls short of the proximate cause standard, which requires a showing that the crime, "in a natural and continuous sequence, unbroken by any new cause, produced the injury" and that the injury would not have occurred absent the

crime. *See Becker*, 2018 UT App 81, ¶ 13 (quotation simplified). Thus, the claims analyst reviewed the treatment plan and invoices under a standard of causation that fell short of proximate cause, rendering the claims analyst's conclusion an insufficient basis upon which to order restitution.

¶18 But even if the claims analyst had reviewed the materials for proximate cause, a "trial court must determine whether restitution is available from the record before it rather than from assumptions about the analysis an administrative agency may have employed in reaching its conclusions under a distinct statute that . . . has different goals and limitations." *State v. Brown*, 2009 UT App 285, ¶ 12 n.10, 221 P.3d 273, *overruled on other grounds by Ogden*, 2018 UT 8. In other words, the court may not delegate the determination of proximate cause to UOVC.

¶19 The State contends that "[a] qualified mental health provider . . . met with Victim and conducted an evaluation from which he determined that her mental health problem resulted from the criminal conduct in this case." This determination was, according to the State, included in the treatment plan that a claims analyst reviewed for "crime-relatedness." While this may be true, it is an insufficient basis on which the district court could find the necessary causal relationship between the crime and each of the 25 therapy sessions. As discussed above, the district court may not substitute UOVC's judgment for its own. Instead, so that the court could make its own determination based on the evidence, it was incumbent on the State to include in the record the materials the claims analyst relied on or other evidence, such as testimony from Victim or her therapist, to permit the court's direct review of the evidence establishing causation. *See Becker*, 2018 UT App 81, ¶ 15 (concluding that "a bare itemized list of expenses" without "receipts, insurance, or provider information" related to the victim's injury was insufficient "to demonstrate that [the defendant's] conduct produced the injury, and without which the injury would not

have occurred") (quotation simplified). Thus, because the only evidence the State presented at the restitution hearing required the court to rely on UOVC's determinations regarding a lower standard of causation and did not allow the court to make its own, independent determination on the subject, the State's evidence was an insufficient basis for the court's restitution award.

¶20 The State further argues that in addition to relying on the list and Restitution Specialist's testimony, the district court also based its decision on evidence presented at trial. It asserts that "[t]here is no doubt that Watson's hostile conduct toward Victim from the very beginning, including his foul language and threats toward Victim . . . was the sole causative factor" of Victim's need for therapy. It is inarguable that Watson's abhorrent conduct could well have proximately caused Victim's need for mental health care, but the trial evidence focused on Watson's criminal conduct toward Victim; it did not address the subsequent effect that conduct had on her mental well-being. Although Victim testified that she was "scared" at the time of her confrontation with Watson, she did not testify regarding the subsequent effects the incident had on her, and the State did not introduce other evidence of Victim's symptoms or diagnosis. Thus, the trial evidence left a gap between Watson's actions and Victim's subsequent need for therapy, which gap, as discussed above, the evidence presented at the restitution hearing failed to fill.

## CONCLUSION

¶21 The evidence the State presented both at trial and at the restitution hearing was insufficient to establish that Watson's criminal conduct proximately caused Victim's need for the mental health therapy she received. Accordingly, we vacate the district court's restitution order.

———